IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs February 14, 2006

## STATE OF TENNESSEE v. JAMES O. MCCARSON, JR.

**Direct Appeal from the Circuit Court for Humphreys County**
**No. 10701     Robert Burch, Judge**

—————————

**No. M2005-01094-CCA-R3-CD - Filed March 24, 2006**

—————————

The Defendant, James O. McCarson, Jr., was convicted of one count of stalking, a Class A misdemeanor. The trial court sentenced the Defendant to eleven months and twenty-nine days, to be served on probation. On appeal, the Defendant contends that: (1) the evidence is insufficient to sustain his conviction for stalking; and (2) the trial court erred when it denied him judicial diversion. Finding that there exists no reversible error, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and JAMES CURWOOD WITT, JR., J., joined.

William B. "Jake" Lockert, III, Ashland City, Tennessee (on appeal) and R. Stephen Powers and Dawn Kavanagh, Ashland City, Tennessee (at trial) for the Appellant, James O. McCarson, Jr.

Paul G. Summers, Attorney General and Reporter; C. Daniel Lins, Assistant Attorney General; Dan M. Alsobrooks, District Attorney General; and Lisa Donegan, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**
**I. Facts**

This case arises from the Defendant's conviction for stalking the victim, Misty Stanfield. At the Defendant's trial, the following evidence was presented: Misty Stanfield testified that she is married with two children, and her husband works at night from 6:00 p.m. to 7:00 a.m. Stanfield knew the Defendant because he was her sister's husband, and while the two had been married approximately two years they were going though a divorce at the time of trial. Stanfield said that the Defendant was aware of her husband's work schedule and knew that she was home alone with

-1-

her children in the evening. Stanfield testified that she swore out an affidavit of complaint against the Defendant for stalking on December 31, 2003, because of his actions prior to that date.

Stanfield testified that, on May 15, 2003, she was in her house around 9:00 p.m. when she woke up her son to look at an eclipse. She recalled that her dogs were barking, but she did not know why and assumed that maybe they were barking at deer. As she and her son were walking outside to view the eclipse, she saw someone hunkered or crouched below her window by her steps. Stanfield said that she got a telescope to look at the eclipse and screamed because she almost hit the hiding man in the head. She recalled that she was able to see that the person was the Defendant when he jumped up from under the window. The Defendant said to her "don't hit me. It's just me" and that he just wanted to scare her. Stanfield said that the Defendant told her that while he was jogging he saw her front porch light on, but Stanfield found this odd because she said that her front porch is about fifteen yards from the street so she did not think that the Defendant would have had time to reach the porch from the street after he saw the light turn on. Stanfield explained that the Defendant lived 0.2 miles from her house, and the Defendant's car was parked at his house. She said that she was scared and did not remember what clothes the Defendant was wearing, but she did recall that he did not appear to be perspiring.

Stanfield said that there were several other occurrences when, at night, her dogs would bark and she would look outside and see the Defendant "prowling around the house." She wondered what he might be doing and thought that maybe he was borrowing her husband's farm tools, but common sense told her that the Defendant would not need farm tools at such a late hour, 10:00 or 11:00 p.m. or 12:00 a.m. Stanfield said that when she would look out of her house at night and see the Defendant she was scared. She would sometimes call her grandmother to come and get her. She recalled that she mentioned the Defendant's behavior to her sister, who said that the Defendant was just jogging and that there was no telling what he was doing.

Stanfield testified that she was unsure how many times she saw the Defendant looking in her windows late at night between May 15, 2003 and September 24, 2003. She said that on September 24, 2003, she went to her sister's house because the Defendant said that he was leaving her sister that day. Stanfield said that when she arrived the Defendant told her that he had a problem and that he had picked up a pamphlet from a doctor's office about sex addicts. Stanfield recalled that the Defendant said that he had done bad things to her and that he was watching her through her window. She said that he then told her what her body looked like compared to her sister's body, and he said he was going to get help. Stanfield said that the Defendant told her that by stalking her he was in the second stage of what a sex addict does and that the fourth stage is rape and murder. She said that the Defendant told her how he would sneak in her house and place her blinds up so he could see through the blinds. Stanfield said that the Defendant told her that this had been going on since the beginning of the year, even though she had not caught him until May.

Stanfield said that she did not file this warrant because of the domestic dispute between the Defendant and her sister. She explained she waited from September to December to file the warrant because she was very embarrassed since the Defendant was her brother-in-law and since she and her

husband were the Defendant's young adult pastors at their church. Stanfield testified that the Defendant continued to drop by at odd hours of the night and morning even after September 24th, and her husband and father convinced her to press criminal charges.

On cross-examination, Stanfield reiterated that these criminal proceedings had nothing to do with the Defendant's divorce from her sister. She said that she did not know when the divorce was filed but agreed it was sometime in November of 2003. She reiterated that she did not go to the police immediately because she was embarrassed for herself and her sister, and she was scared. She said that she tried to minister to the Defendant. Stanfield agreed that the first night that the Defendant scared her she was concerned about him stalking her and that it seemed odd that he was outside her house. Stanfield described several other incidents when the Defendant was "prowling" outside her window. She said that she was not "really scared" until he admitted what he was doing, and she realized that he was sick. She said that, prior to this, she was scared because she did not know what the Defendant was doing.

Stanfield said that she learned that the Defendant was a sex addict by his own admission and by other events. She said that the Defendant had tried to have sex with his brother and his sister, and he peeked in the windows at his step-mother's house. Stanfield said that the Defendant continued to drive by her house between September and December, even when her sister no longer lived next door. Her sister had moved into her parents' house because the Defendant had been breaking into her sister's house. Stanfield said that she did not think that this criminal action helped her sister in the divorce. She conceded that her sister had custody of the children but said that the Defendant agreed to give her custody. She agreed that the Defendant's visitation with the children is supervised by her sister. Stanfield said that she also decided to press charges against the Defendant when she realized that he was parking near her home and listening to her telephone conversations over a scanner.

Stanfield said that she knew the Defendant's brother, Daniel McCarson, and she went to visit him after he was in a car accident around February or March of 2004. She explained that Daniel's wife, Jessica, is her very close friend. She said that the Defendant was not there the first few times that she visited, but she did see him once in passing. She testified that she was not scared of him at that point because she knew that there would be plenty of people there with her. Stanfield said that she visited the Defendant's brother in the hospital when he was there for a problem with his diabetes, but she did not see the Defendant.

Amanda McCarson testified that she is Stanfield's sister and the Defendant's ex-wife but explained that the divorce was still pending. She said that the two were married almost three years and were separated in September of 2003. McCarson recalled that, on September 23, 2002, the Defendant told her that he had had an affair for the second time, and she decided that she did not want to live like that anymore. She said that the next day she went to work and her sister came to help the Defendant move out. McCarson said that, on November 20, 2003, the Defendant admitted to her during a telephone conversation that all the nights that he had said that he was out jogging he was actually going to her sister's house and peeking though the windows. The Defendant told her

that he had masturbated while watching her sister and that he had masturbated to pictures of her sister because her sister looked like McCarson. McCarson testified that she woke up at four or five o'clock one morning between December of 2003 and February of 2004 and heard the Defendant driving by in his truck. She got up and looked out her window and saw the Defendant driving slowly by her sister's house. At that point, she moved out of her house and into her parents' house.

On cross-examination, McCarson said that she was scared, but she did not take out a warrant for stalking because the Defendant was not stalking her. McCarson said that she filed for divorce on November 10, 2003, and she said that she did not mention that the Defendant was a sex addict in the divorce papers because they were filing an uncontested divorce. She said that she later did file papers alleging that the Defendant was a sex addict. McCarson said that the criminal warrant and the divorce case had nothing to do with each other. She said that her sister thought that the Defendant would stop, but, when he continued his behavior, her sister felt that she had to stand up to him.

On redirect examination, McCarson said that she did not testify in this case to help her divorce case in any way. She said that the divorce proceedings were essentially over except for the entry of the order. Further, all of the terms and details of the divorce had already been worked out. McCarson said that she first talked with a divorce attorney on October 14th, and the Defendant admitted to her what he had been doing on November 20th.

The Defendant testified that he has not been stalking his sister-in law. He said that he drove by her house when he was going to see his son for visitation. The Defendant said that, originally, he did not contest the divorce because McCarson told him that the two may reconcile if he signed the papers. When he realized this may not be the case, he hired a lawyer. Within a week of his hiring a lawyer, he learned that Stanfield had filed stalking charges against him. The Defendant said that, on May 15, 2003, he was out jogging when he saw Stanfield's lights come on at her house. He said that he talked to her when she came out of the house, and she told them that she and her son were going to watch the eclipse. The Defendant denied that he was hiding by her steps. The Defendant testified that, while jogging, he had seen Stanfield walk though her house without clothes on, and he told his wife about the incident. The Defendant said that he went to Stanfield's house when she called to say that she was scared because she had heard something, and he stayed for a couple of hours. He denied that he had ever been outside her bedroom window.

The Defendant said that, on September 24, 2003, he had a conversation with Stanfield during which she said that McCarson and the Defendant may be able to work things out if the Defendant got help. The Defendant agreed that the reason that he went to a doctor was to help work out his marriage. The Defendant denied driving by Stanfield's house, but he said that he had seen her during his supervised visitation and when his brother and father were in the hospital. The Defendant said that the two talked at the hospital. The Defendant said that at Christmas he went to give his son a Christmas present at McCarson's mother's house, and he was instructed not to come back there. He said that he left the house and was subsequently arrested for trespassing. Shortly thereafter, he was arrested for stalking Stanfield.

On cross-examination, the Defendant said that he was on the road jogging when Stanfield and her son came out of the house to look at the eclipse. The Defendant said that he had never sneaked around her house. The Defendant agreed that September 24, 2003, was the day after McCarson had confronted him about a second affair and that on that day he told Stanfield that he had seen her through her windows. He testified that he told Stanfield that he had seen her walk naked in front of her windows, but he told her that he was at the road jogging when he saw this. The Defendant was unclear why, during this conversation about his divorce, he brought up the subject of Stanfield walking unclothed in her house. The Defendant said that he had a pamphlet about being a sex addict, and he and Stanfield discussed this pamphlet. The Defendant admitted that he had been to see a sex therapist, and his divorce lawyer had spoken with the therapist. The Defendant denied knowing that the therapist was deposed for the divorce case. The Defendant said that he believed that Stanfield had pressed criminal charges to keep him from his son. The Defendant denied confessing to an elder at his church, Richard "Dick" Kholi, that he was peeking in Stanfield's windows.

On redirect examination, the Defendant said that he was not a sex addict and that his wife, her mother, and her sister were the first people to tell him that he was an addict. He said that he loved his wife, and he wanted to have sex with her a lot more than she did with him. The Defendant said that the only reason that he picked up the sex addict pamphlet was to read it and see if what they were telling him was true. He said that he also went to see a doctor four or five times to save his marriage, but he did not believe that he was a sex addict.

Michelle McCarson testified that she is the Defendant's step-mother, and she recalled that, when the Defendant's brother was in a car accident, the Defendant and Stanfield were at the hospital at the same time visiting him on many occasions. Michelle McCarson said that she was unaware of any problems between the Defendant and Stanfield prior to the filing of this lawsuit.

James McCarson, Sr., testified that the Defendant is his son. He recalled that his son, Daniel, the Defendant's brother, was in a car accident where he suffered serious injuries, and he was in Vanderbilt, or an affiliate thereof, for more than two weeks. During that time, Stanfield visited while the Defendant was there and the two did not seem to have a problem between them.

In rebuttal, the State called Richard "Dick" Kholi, who testified that he is an elder at the Defendant's church, which is also where Stanfield is the youth pastor. He said that the Defendant told him that the Defendant could look into Stanfield's house and see everything that was going on and that she did not know that he was there. Kholi said that the Defendant told him that he could go up on the hill and sit there and look into Stanfield's house without anyone knowing he was there. The Defendant also told him that the Defendant could listen to Stanfield's telephone conversations. Kholi said that the Defendant told him that he was "sexually addicted." Kholi testified that the Defendant told him that any time that he wanted to he could go into the Stanfield's house.

On cross-examination, Kholi said that he had known both families involved in this case for

the same amount of time.  Kholi said that the Defendant told him that he can listen and hear if Stanfield is talking to another man.  He reiterated that the Defendant said that he "can" do those things but did not specifically say that he "did" those things.

Based upon this evidence the jury found the Defendant guilty of one count of stalking, a Class A misdemeanor.

## II. Analysis

On appeal, the Defendant contends that: (1) the evidence at trial is insufficient to sustain his conviction; and (2) the trial court abused its discretion when it denied his request for judicial diversion.

### A. Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to sustain his conviction because the State did not prove that the victim was in "reasonable fear" of the Defendant committing assault, bodily injury or death.  When an accused challenges the sufficiency of the evidence, an appellate court's standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 324 (1979); State v. Duncan, 698 S.W.2d 63, 67 (Tenn. 1985).  This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence.  State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence.  State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).  Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence.  State v. Buggs, 995 S.W.2d 102, 105 (Tenn. 1999); Liakas v. State, 286 S.W.2d 856, 859 (Tenn. 1956).  Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact.  Liakas, 286 S.W.2d at 859.  This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence.  State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992).  Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict.  Id.

"A person commits the offense of stalking who intentionally and repeatedly follows or harasses another person in such a manner as would cause that person to be in reasonable fear of

being assaulted, suffering bodily injury or death." Tenn. Code Ann. § 39-17-315(a)(1) (2003).[1] "'Follows' means maintaining a visual or physical proximity over a period of time to a specific person in such a manner as would cause a reasonable person to have a fear of an assault, bodily injury or death," and "'[h]arasses' means a course of conduct directed at a specific person which would cause a reasonable person to fear an assault, bodily injury, or death, including, but not limited to, verbal threats, written threats, vandalism, or unconsented-to physical contact." Tenn. Code Ann. § 39-17-315(a)(2)(A), (B) (2003). "Repeatedly" refers to two or more separate occasions. Tenn. Code Ann. § 39-17-315(a)(2)(C) (2003). Stalking is a "continuing offense," based upon the proscriptive statute "contemplat[ing] a series of discrete actions amounting to a continuing course of conduct." State v. Hoxie, 963 S.W.2d 737, 743 (Tenn. 1998).

We conclude that the evidence, when viewed in the light most favorable to the State, is sufficient to sustain the Defendant's conviction. Stanfield saw the Defendant on May 15, 2003, when he was crouched by her stairs near her window late at night. She said that she found this odd, and he scared her. Several other times, Stanfield saw the Defendant at late hours prowling around the house and looking into her windows, which scared her sometimes so much so that she would call her grandmother to come and get her. On September 24, 2003, Stanfield had a conversation with the Defendant during which he admitted that he was a sex addict and that he had gotten a pamphlet about this addiction. The Defendant told Stanfield that he was in stage two of his addiction and that stage four was rape and murder. The Defendant said that he had done bad things to her and that he was watching her through her window, and he told Stanfield's sister that he masturbated while watching Stanfield. The Defendant told Stanfield how her body compared to her sister's body and told her how he would sneak in her house and place her blinds up so he could see through the blinds. Stanfield said that the Defendant told her that this had been going on since the beginning of the year, even though she had not caught him until May. After this conversation, the Defendant continued to drive slowly past Stanfield's house and drop by her house at odd hours of the night. We conclude that a rational juror could have determined that Stanfield feared assault, bodily injury, or death due to the actions of the Defendant. The Defendant, therefore, is not entitled to relief on this issue.

## B. Judicial Diversion

The Defendant argues that the trial court abused its discretion in declining to impose a sentence pursuant to Tennessee Code Annotated section 40-35-313 (2003), commonly referred to as "judicial diversion." According to this statute, the trial court may, at its discretion, following a determination of guilt, defer further proceedings and place a qualified defendant on probation without entering a judgment of guilt. Tenn. Code Ann. § 40-35-313(a)(1)(A). A qualified defendant is one who:

> (a) Is found guilty of or pleads guilty or nolo contendere to the offense for

---

[1]We note that the statute has been rewritten effective July 1, 2005. We, however, cite to the statute pursuant to which the Defendant was convicted.

which deferral of further proceedings is sought;

(b) Is not seeking deferral of further proceedings for a sexual offense or a Class A or Class B felony; and

(c) Has not previously been convicted of a felony or a Class A misdemeanor.

Tenn. Code Ann. § 40-35-313(a)(1)(B)(i)(a), (b), (c). When a defendant contends that the trial court committed error in refusing to grant judicial diversion, we must determine whether the trial court abused its discretion by denying the defendant's request for judicial diversion. State v. Electroplating, Inc., 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998); State v. Cutshaw, 967 S.W.2d 332, 344 (Tenn. Crim. App. 1997). Judicial diversion is similar to pretrial diversion; however, judicial diversion follows a determination of guilt, and the decision to grant judicial diversion is initiated by the trial court, not the prosecutor. State v. Anderson, 857 S.W.2d 571, 572 (Tenn. Crim. App. 1992). When a defendant challenges the trial court's denial of judicial diversion, we may not revisit the issue if the record contains any substantial evidence supporting the trial court's decision. Cutshaw, 967 S.W.2d at 344; State v. Parker, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996). In Anderson, this Court stated:

> We conclude that judicial diversion is similar in purpose to pretrial diversion and is to be imposed within the discretion of the trial court subject only to the same constraints applicable to prosecutors in applying pretrial diversion under T.C.A. § 40-15-105. Therefore, upon review, if "any substantial evidence to support the refusal" exists in the record, we will give the trial court the benefit of its discretion. Only an abuse of that discretion will allow us to overturn the trial court.

Anderson, 857 S.W.2d at 572 (citation omitted).

The criteria that the trial court must consider in determining whether a qualified defendant should be granted judicial diversion include the following: (1) the defendant's amenability to correction; (2) the circumstances of the offense; (3) the defendant's criminal record; (4) the defendant's social history; (5) the defendant's physical and mental health; and (6) the deterrence value to the defendant and others. Cutshaw, 967 S.W.2d at 343-44; Parker, 932 S.W.2d at 958. An additional consideration is whether judicial diversion will serve the ends of justice, i.e., the interests of the public as well as the defendant. Cutshaw, 967 S.W.2d at 344; Parker, 932 S.W.2d at 958; State v. Bonestel, 871 S.W.2d 163, 168 (Tenn. Crim. App. 1993), *overruled on other grounds by* State v. Hooper, 29 S.W.3d 1, 9 (Tenn. 2000). Additionally, this Court has held that a defendant's failure to be completely truthful about the circumstances of the crime he committed and to accept full responsibility made him a poor candidate for diversion. State v. Nease, 713 S.W.2d 90, 92 (Tenn. Crim. App. 1986).

In the case under submission, the trial court stated:

> In considering the proof before the Court, the Court first determines whether post trial diversion is a proper resolution of this situation; and the Court determines

that it is not. The Motion for Post Trial Diversion is denied because of the untruthfulness of the defendant on the witness stand, obviously. However, the jury arrived at a verdict, they had to reject this testimony. But more than that were the numerous instances of this occurrence that were proved during the trial.

Had this been one or two times, I might look at it differently; but there was proof that there were – that this was a course of conduct on the part of the defendant; and I do not think because of that that post tr[ia]l diversion would be proper. I think if this defendant is going to follow this type of course of conduct that this stalking conviction needs to be on his record so that it can be handled appropriately if it happens again.

The trial court considered the Defendant's amenability to correction when it concluded that this offense should be on the Defendant's record to ensure that if this situation arises again, meaning that if the Defendant stalks someone again it can be handled properly. Further, the trial court considered the circumstances of this offense in that the Defendant engaged in numerous instances of looking through the victim's window and masturbating while doing so. The trial court also considered the untruthfulness of the Defendant. In light of this evidence, we conclude that the trial court did not abuse its discretion when it denied the Defendant's request for judicial diversion. This issue is without merit.

### III. Conclusion

In accordance with the foregoing authorities and reasoning, we affirm the judgment of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE